## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**DIANNE KROHMER-BURKETT,**

    **Plaintiff,**

v.                                      **Case No. 8:03-cv-873-T-30MAP**

**HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,**

    **Defendant.**

_____/

### ORDER

THIS CAUSE comes before the Court upon Plaintiff's Motion for Summary Judgment (Dkt. 26), Defendant's response thereto (Dkt. 36), Defendant's Motion for Summary Judgment (Dkt. 27), and Plaintiff's response thereto (Dkt. 37).[1] For the reasons set forth below, this Court finds Defendant's Motion for Summary Judgment is **GRANTED.**

### I. BACKGROUND

Plaintiff's cause of action, arising under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* (hereinafter "ERISA"), challenges Defendant's discontinuation of Plaintiff's long-term disability (hereinafter "LTD") benefits payments. Plaintiff was

---

[1]Plaintiff has also filed a Request to take Judicial Notice of Social Security Administration (hereinafter "SSA") Notice of Decision- Fully Favorable Order Entered May 27, 2005 (Dkt. 53-1). While this Court would take Judicial Notice of such decision, Plaintiff's SSA decision is of no consequence to the disposition of the Motions for Summary Judgment as this Court must consider only that information that was present at the time Defendant made the decision to terminate Plaintiff's benefits. As the decision to terminate benefits was made in 2001, a SSA decision entered in 2005 cannot be considered. As such, Plaintiff's Request (Dkt. 53-1) is **DENIED**.

employed as a Coding Specialist for Columbia New Port Richey Hospital and was a participant in an ERISA welfare benefit plan (hereinafter "the Plan") funded by a group disability insurance policy (hereinafter "the Policy") held by Plaintiff's employer[2] and issued by Defendant. Under the terms of the Plan, Plaintiff was entitled to long term disability (hereinafter "LTD") benefit payments if she (a) became "disabled from a covered accidental bodily injury, sickness or pregnancy;" (b) remained disabled through the elimination period;[3] and (c) submitted "proof of loss" that was "satisfactory" to Hartford Life. The Plan further provided that LTD benefit payments would end should Plaintiff become "no longer disabled," or if she failed to "furnish proof, when requested by [Hartford], that [she] continued to be disabled." Pursuant to the Plan, "disabled," also referred to as "totally disabled," was defined as:

> **Total Disability** or **Totally Disabled** means that:
> (1) during the Elimination Period; and
> (2) for the next 24 months, you are prevented by:
>     (a) accidental bodily injury;
>     (b) sickness;
>     (c) mental illness;
>     (d) substance abuse; or
>     (e) pregnancy;
> from performing the essential duties of your occupation.

---

[2] Columbia/HA Healthcare Corporation is the named policyholder on the Schedule of Insurance.

[3] According to the terms of the Plan, as detailed in the Employee Benefit Handbook, the elimination period is the period of time one must be Totally Disabled *before* benefits become payable. Specifically, the elimination period was the latter of "(1) the first 5 consecutive months of any one period of Total Disability; or (2) with the exception of benefits required by state law, the expiration of any Employer sponsored short term disability benefit or salary continuation program."

> After that, you must be so prevented from performing one or more of the essential duties of any occupation for which you are qualified by education, training, or experience.

Additionally, under the terms of the Plan, Defendant, as plan administrator, had "full discretion and authority to determine eligibility for benefits."

Plaintiff's employment with her employer ended January 1997. After short term disability benefits were paid to Plaintiff due to symptoms associated with fibromyalgia and Chronic Fatigue Syndrome (hereinafter "CFS"), Plaintiff, on June 4, 1997, began receiving LTD benefits. Pursuant to the Plan, Plaintiff would receive her LTD benefits for the next 24 months or until June 4, 1999. After June 4, 1999, to be eligible for continued LTD benefits, Plaintiff was required to provide medical proof that she was prevented from performing the essential duties of any occupation. As plan administrator, Defendant was responsible for reviewing Plaintiff's file, including any additional information she wished to submit for consideration, to determine whether Plaintiff was eligible for continued benefits under the Plan.

On March 9, 1999, Defendant forwarded a letter to Plaintiff advising her that as of June 4, 1999, the 24 month period on her claim would expire. The letter stated that in order for Plaintiff to receive continued benefits under the Plan's "any occupation" definition of disability, Plaintiff had to provide an Attending Physician's Statement (hereinafter "APS") and a Physical Capacities Evaluation (hereinafter "PCE") form, both of which were to be completed by her treating physician. Plaintiff was given until April 20, 1999 to submit these

completed forms. Plaintiff returned these forms along with additional medical records. Upon receipt of the forms, Defendant, in addition to reviewing the submitted forms, also examined a video surveillance of Plaintiff conducted by a private investigation firm, Dempsey Investigations, Inc.[4]

On July 20, 2001, Defendant transmitted a denial letter to Plaintiff advising that due to the lack of medical documentation supporting a finding of continued disability after June 4, 1999, her benefits would be discontinued. Specifically, Defendant stated that the evidence in Plaintiff's claim file supported a finding that effective June 4, 1999, she was capable of performing any type occupation and no longer met the definition of total disability as defined under the Plan. Plaintiff subsequently appealed Defendant's decision and submitted additional medical information in support of her appeal. Among the documents submitted for

---

[4]On June 25, 2001, in order to obtain information as to Plaintiff's level of activity, Defendant hired Dempsey Investigations, Inc. to conduct visual and video surveillance of Plaintiff. During the surveillance, Dempsey captured Plaintiff for 14.5 minutes performing the following activities:

> loading 7 bags of groceries, 2 one gallon jugs of water, 24 [soda] can box from shopping cart to the back seat of the vehicle, lifting grocery bags two at a time, lifting one gallon jug and 24 [soda] can box from bottom of cart on one occasion, bending into back seat area without hand support with above items, entering/exiting a motor vehicle with no difficulties, running errands, wedding, placing a sun guard up against from windshield and twisting upper body from sitting position.

In his report, the investigator noted that at no time during his surveillance did Plaintiff "exhibit any apparent physical limitations."

Defendant's consideration were medical records from her treating physician, Dr. Richard Plummer.

In response to Plaintiff's appeal, Defendant, through Medical Advisory Group, LLC, conducted a medical review of Plaintiff's entire claim file and treatment records. The review was performed by Dr. Todd J. Lyon, who, upon completing his review, provided Defendant a nine page report detailing and describing the contents of his review and medical consultations. Dr. Lyon also offered his medical findings and conclusions. Among the documents and information reviewed and analyzed by Dr. Lyon were the following:

1). an October 8, 1997 APS of Dr. Michael Cichon wherein he diagnosed Plaintiff with chronic fatigue syndrome, fibromyalgia, cervical and back pain, and irritable bowel syndrome. In the APS, Dr. Cichon opined that Plaintiff was totally disabled;

2). a February 11, 1998 APS of Dr. Cichon wherein he confirmed his previous diagnoses and indicated that Plaintiff was capable of walking and standing for 2 hours at a time, sitting for 2 to 3 hours at a time, driving and keyboarding for 1 to 2 hours and 1 hour of lifting, reaching, pushing and pulling. Dr. Cichon also indicated that Plaintiff required frequent periods of rest secondary to fatigue. Additionally, Dr. Cichon advised that Plaintiff was able to occasionally lift 20 pounds and appeared capable of sedentary work. Dr. Cichon further advised that Plaintiff would be limited by her tolerance;

3). Dr. Plummer's January 31, 2000 APS wherein he diagnosed Plaintiff with CFS, fibromyalgia, osteopenia, and irritable bowel syndrome. Dr. Plummer recommended that Plaintiff engage in activities as tolerated;

4). a March 26, 2001 note from Dr. Leonard Strichman,[5] Neurosurgeon, which indicated that Plaintiff had a "slight decrease of triceps strength on right" and a "slight decrease of the intrinsic strength of the right hand." These decreases in muscular strength were not, according to Dr. Lyon, quantified. In addition to conducting his

---

[5]Plaintiff was referred to Dr. Strichman by Dr. Adam Dahmer, Chiropractor, after Plaintiff's involvement in a motor vehicle accident in January of 2001.

own physical examination, Dr. Strichman also noted the degenerative changes described on a January 18, 2001 MRI, which indicated Plaintiff was experiencing moderate to considerable foraminal stenosis[6] in her spine;

5). Dr. Plummer's May 10, 2001 notes stating that Plaintiff was demonstrating a decreased range of motion of the cervical and lumbosacral spines.[7] However, according to Dr. Lyon, no reduced range of motion was specified. Dr. Plummer diagnosed Plaintiff with cervical strain, left rib contusion and a lumbar strain;

6). a May 21, 2001 claimant interview sheet completed by Plaintiff indicating that she volunteered for Jehovah's Witnesses and did field ministry, which involved door to door calling. Plaintiff also indicated that she attended Jehovah Witness meetings twice a week and bible study courses once a week;

7). a June 15, 2001 FCE[8] completed by Dr. Plummer indicating Plaintiff could only drive, sit, stand and walk less than 15 minutes at a time and less than1 hour a day. On the FCE, Dr. Plummer restricted Plaintiff to occasionally lifting 10 pounds and occasionally climbing stairs. Dr. Plummer also indicated that Plaintiff could occasionally finger, handle, feel and reach and recommended no repetitive use of her hands or feet. According to Dr. Lyon, Dr. Plummer did not provide an explanation for the specific restrictions and limitations;

8). Dr. Plummer's June 18, 2001 APS indicating Plaintiff cannot walk, stand or sit for more than 15 minutes secondary to complaints of fatigue and discomfort;

9). a video surveillance conducted by Dempsey Investigations, Inc; and

---

[6] The Court takes judicial notice of Merriam Webster Medical Dictionary's website which defines stenosis as a narrowing or construction of the diameter of a bodily passage or orifice and foranimal as a small opening, perforation, or orifice. See http://www2.merriam-webster.com/cgi-bin/mwmednlm

[7] According to Dr. Plummer's notes, Plaintiff was involved in another motor vehicle accident on May 4, 2001.

[8] In reviewing the documents contained in the record, this acronym is not defined. However, according to the American Occupational Therapist Association, Inc.'s website defines the acronym as a Functional Capacity Evaluation. The Court, therefore, pursuant to F.R.E. 201(c), takes judicial notice of the AOTA's website and the definition of said acronym. See http://www.aota.org

>10). a February 2, 2002 telephone call to Dr. Plummer wherein Dr. Plummer stated that Plaintiff's diagnoses of fibromyalgia and CFS had not been substantiated and opined that Plaintiff retained the physical capabilities to meet the demands of full time sedentary work.

Based on the information reviewed, Dr. Lyon opined that Plaintiff was capable of engaging in not only sedentary work, but light work on a full time basis. Defendant, thereafter, conducted an Employability Analysis[9] to determine what occupation Plaintiff was qualified for and capable of performing based on her physical restrictions. The analysis identified Plaintiff's previous occupation of Coding Specialists along with various other occupations. Based upon Dr. Lyon's report and the results of the Employability Analysis, Defendant upheld its decision to terminate Plaintiff's LTD benefits.

Subsequent to this second denial, Plaintiff filed another appeal and submitted additional records for Defendant's consideration. Specifically, Plaintiff submitted:

>1). an August 3, 2001 treatment note of Dr. Farrukh Zaidi, Internist and Rheumatologist, discussing his impression of fibromyalgia and chronic neck pain;
>
>2). an October 18, 2001 treatment note of Dr. Zaidi indicating Plaintiff was experiencing stress at home;
>
>3). Dr. Zaidi's treatment note of November 19, 2001 indicating that Plaintiff reported pain, poor sleep and chronic fatigue;
>
>4). a November 13, 2001 treatment note of Dr. David W. Cahill, Neurologist, indicating that Plaintiff's MRIs showed severe degenerative disc disease in the cervical spine, degenerative disc disease at multiple segments in her neck and the possibility of a fusion being done to repair the abnormal disc levels. Dr. Cahill further noted that

---

[9] According to Defendant, the Employability Analysis is a job matching system that cross references a person's qualifications and physical capabilities.

this fusion would not likely get Plaintiff back to work. According to Defendant, the note does not offer any assessment of Plaintiff's functionality or work capacity;

5). Dr. Dennis Lox's January 22, 2002 evaluation of Plaintiff wherein he opined that Plaintiff has positive findings of Coxsackie virus and Epstein-Barr virus, which can cause CFS. Dr. Lox also stated that Plaintiff's fatigue had not improved and "multiple trigger points . . .are indicative of fibromyalgia."  Dr. Lox also noted that due to Plaintiff's history of medical problems and her not being employed since 1997, Plaintiff was not going to return to gainful employment and should be continued on her long term disability.  Dr. Lox did not describe any examination he conducted on Plaintiff nor did he provide any specific restrictions or limitations on her functionality;

6). Dr. Zaidi's May 24, 2002 APS which opined that Plaintiff was capable of sedentary work[10];

7). Dr. Zaidi's APS which stated a diagnosis of fibromyalgia and that Plaintiff could not be gainfully employed. However, on the APS, Dr. Zaidi did not specify any limitations or restrictions as a result of the diagnosis[11].

In evaluating Plaintiff's second appeal, Defendant forwarded all of Plaintiff's available medical records to the University Disability Consortium for an independent medical review. This review was conducted by Dr. Jerome Siegel. In performing his review of Plaintiff's file, Dr. Siegel concurred with Plaintiff's diagnoses of fibromyalgia and CFS, but, after reviewing the video surveillance and speaking with Dr. Zaidi, determined that Plaintiff was capable of sedentary to light duty work with physical restrictions.[12] Defendant again denied Plaintiff's

---

[10] According to Defendant, this APS was in connection with a separate disability claim filed by Plaintiff with another insurance company, Mass Mutual.

[11] This APS too was completed pursuant to the Mass Mutual claim.

[12] Upon review of Dr. Siegel's report, another Employability Analysis was done which included the restrictions detailed in Dr. Siegel's report, i.e. lifting no more than 10 pounds, alternating between sitting and standing, no prolonged sitting and standing of more than 30
(continued...)

continuation of benefits stating that, "the weight of the evidence does not support a finding that [Krohmer] was prevented by Disability from performing the essential duties of any occupation for which she is qualified."

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

## III. LEGAL ANALYSIS

### A. *ERISA Standard of Review*

To determine whether a reasonable jury could return a verdict for the non-movant, this Court must determine which standard of review to use in examining Defendant's determination on Plaintiff's LTD claim. There are three standards of review appropriate in

---

[12](...continued)
to 45 minutes at a time and rotation of job tasks and duties. The Employability Analysis identified five full time occupations for which Plaintiff was qualified and capable of performing: Medical Record Technician, Appointment Clerk, Classification Clerk, Medical-Voucher Clerk, and Charge- Account Clerk.

ERISA decisions.  See Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 109 S. Ct. 948, 103 L.Ed. 2d 80 (1989) (comparing ERISA law to trust law and adapting the standards of review from trust law to fit ERISA cases).  First, where an ERISA plan does not grant the fiduciary or plan administrator discretion to determine eligibility for benefits or to construe the terms of the plan, the Court will apply a *de novo* standard of review.  See Williams v. BellSouth Telecommunications, Inc., 373 F.3d 1132, 1135 (11th Cir. 2004); see also Marecek v. BellSouth Telecommunications, Inc., 49 F.3d 702, 705 (11th Cir. 1995).  Second, when the plan does grant the fiduciary or plan administrator such discretion, the "arbitrary and capricious" standard applies..  See Williams, 373 F.3d at 1135.  This standard affords the plan administrator the most deference, allowing for a reversal of the decision only if no "reasonable" grounds exist to support the plan administrator's decision.  See id. at 1137-1138.

Finally, if the plan grants the fiduciary or administrator discretion, but the Court finds a conflict of interest between the fiduciary or administrator and the company, a "heightened arbitrary and capricious" standard applies, and the Court will consider this conflict in its analysis.  See Brown v. Blue Cross & Blue Shield of Alabama, Inc., 898 F.2d 1556, 1566 (11th Cir. 1990) ("[W]e hold that when a plan beneficiary demonstrates a substantial conflict of interest on the part of the fiduciary responsible for benefits determinations, the burden shifts to the fiduciary to prove that its interpretations of plan provisions committed to its discretion was not tainted by self-interest").  However, only if the Court disagrees with the ultimate decision of the administrator, i.e., the administrator's decision to deny benefits was

wrong, does the Court examine whether a conflict exists. See Yochum v. Barnett Banks, Inc. Severance Pay Plan, 243 F.3d 541,544 (11th Cir. 2000) (citing Maracek, 49 F.3d at 705).

Defendant argues that because the language of the Policy grants them sole authority to determine eligibility, this Court should apply the arbitrary and capricious standard. In contrast, Plaintiff argues that because Defendant both administered and funded the Plan, a potential conflict of interest arose and the heightened arbitrary and capricious standard is appropriate.[13] This Court agrees.[14]

## B. *Long Term Disability Benefits*

When using the heightened arbitrary and capricious standard, this Court must first apply the *de novo* standard and determine whether Defendant's decision to deny Plaintiff benefits under the Plan was "wrong." See HCA Health Services of GA, Inc. V. Employer Health Insurance, CO., 240 F.3d 982, 993b (11th Cir. 2001). The term "wrong" has been used by the Eleventh Circuit "to describe the conclusion a court reaches when, after reviewing the plan documents and disputed terms *de novo*, the court disagrees with the claims administrator's plan interpretation." Id. at 994 fn 23 (citing Yochum, 234 F.3d 541).

---

[13]Plaintiff has also argued that this court should apply the *de novo* standard of review. However, in light of the clear and unambiguous language of the Plan which grants Defendant full discretion, the *de novo* standard of review is inapplicable.

[14]What presently is in the record is Defendant's Employee Benefits Handbook and the Policy's Booklet-Certificate. Although this Court instructed Defendant to produce the policy, no policy was ever produced. In light of Defendant's failure to produce the actual policy, the Court accepts Plaintiff's version of the facts and finds that Defendant both administered and funded the Plan and potential conflict of interest existed.

Plaintiff argues that because the medical records submitted by various physicians indicated that Plaintiff's fibromyalgia, CFS and other medicinal problems rendered her disabled and unable to engage in any sustained work activity, Defendant's decision to terminate Plaintiff's benefits was wrong. However, based on the evidence before Defendant at the time of its decision, this Court does not agree with Plaintiff's assessment. There does not appear to be any dispute as to whether Plaintiff's suffers from fibromyalgia or CFS. What is disputed and had to be demonstrated by Plaintiff to Defendant at the time her claim for benefits was being considered was whether Plaintiff's conditions rendered her totally disabled as defined under the Plan. Based on a review of the evidence in the record, this Court cannot say that Defendant's decision to deny Plaintiff continued benefits under the Plan was *de novo* wrong. Defendant thoroughly gathered and reviewed all medical information, including that information provided by Plaintiff, concerning Plaintiff's condition. Pursuant to the Plan, in order to continue receiving LTD benefits, Plaintiff, as a direct consequence of her disability, had to be "so prevented from performing one or more of the essential duties of any occupation for which she was qualified." Nothing in the record indicates Plaintiff was so prevented. As such, this Court will not disturb Defendant's determination.

## IV.  CONCLUSION

Based on a review of the record, there are no material issues of fact for the jury to consider. As such, it is ORDERED AND ADJUDGED that:

1. Defendant's Motion for Summary Judgment (**Dkt. #27**) is **GRANTED**.

    2.        Plaintiff's Request to Take Judicial Notice of Social Security Administration Notice of Decision - Fully Favorable Order Entered May 27, 2005 (**Dkt. #53-1**) is **DENIED**.

    3.        All pending motions, if any, are denied as moot. Clerk is directed to CLOSE this file.

**DONE** and **ORDERED** in Tampa, Florida on October 14, 2005.

                                        /s/ James S. Moody, Jr.
                                        JAMES S. MOODY, JR.
                                        UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Odd\2003\03-cv-873 Motion Summary Judgment ERISA.wpd